1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF ILLINOIS

3

4

UNITED STATES OF AMERICA,      )
5                              )
              Plaintiff,       )
6                              )   Criminal No. 4:17-40049
       vs.                     )
7                              )
TODD B. RAUFEISEN,             )
8                              )
              Defendant.       )
9

10            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE SARA DARROW
11            SENTENCING HEARING
        SEPTEMBER 14, 2017; 10:08 A.M.
12            ROCK ISLAND, ILLINOIS

13

APPEARANCES:

14

15   For the Government:      DONALD B. ALLEGRO, ESQUIRE
                              Asst. United States Attorney
16                            1830 2nd Avenue
                              Rock Island, Illinois 61201
17                            (309) 793-5880

18

19   For the Defendant:       J. STEVEN BECKETT, ESQUIRE
                              Beckett & Webber, P.C.
20                            508 South Broadway
                              Urbana, Illinois 61803-7160
21                            (217) 328-0263

22

23         Jennifer E. Johnson, CSR, RMR, CRR
              U.S. District Court Reporter
24            Central District of Illinois

25   Proceedings recorded by mechanical stenography;
transcript produced by computer

2

1                          INDEX

                                                    PAGE
2

3   VICTIM IMPACT STATEMENTS:

4       Peter Mangieri                          6
        Duncan Cameron                         14
5       John Hudgins                           18
        Jem Hudgins (Via letter)               25
6       David Werning                          29
        Sara Thoms                             32

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      (Proceedings held in open court.)

2      THE COURT:  This is the case of the *United*

3  *States of America vs. Todd Raufeisen*, Case Number

4  17-40049.  Appearing on behalf of the government is

5  AUSA Allegro.  Appearing in open court is the

6  defendant, along with his attorney, Mr. Beckett.

7      This matter comes before me this morning for

8  sentencing hearing.

9      Mr. Allegro, on behalf of the government, are

10 you ready to proceed?

11     MR. ALLEGRO:  Yes, Your Honor.

12     THE COURT:  Thank you.

13     Mr. Beckett, on behalf of Mr. Raufeisen, are

14 you ready to proceed?

15     MR. BECKETT:  Yes, Your Honor.

16     THE COURT:  Thank you.

17     Mr. Allegro, have you satisfied your

18 obligations under the Justice For All Act to notify

19 all victims in this case and provide notice of the

20 hearing and opportunity to be heard?

21     MR. ALLEGRO:  Yes, Your Honor, we have, and

22 there are at least three victims who would like to

23 allocute today.

24     THE COURT:  Okay.  Thank you.

25     Has the government had an opportunity to

1  review the revised presentence investigation

2  report, and does the addendum still accurately

3  reflect that there are no objections to its

4  contents?

5      MR. ALLEGRO:  Correct, Your Honor.

6      THE COURT:  And, Mr. Beckett, have you had an

7  opportunity to review the PSR with Mr. Raufeisen?

8      MR. BECKETT:  Yes.

9      THE COURT:  And it's my understanding, via

10  your sentencing memorandum, that although you

11  originally lodged an objection, that objection has

12  been withdrawn.  Is that correct?

13      MR. BECKETT:  That is correct, Your Honor.

14      THE COURT:  So, does the addendum -- other

15  than that withdrawal -- now accurately state that

16  there are no objections to the contents?

17      MR. BECKETT:  That's correct.  There are no

18  objections.

19      THE COURT:  Thank you.

20      Mr. Raufeisen, have you -- and you can remain

21  seated.  Thank you.  Have you had an opportunity to

22  read your presentence investigation report and

23  discuss it fully with your attorney?

24      THE DEFENDANT:  Yes, I have, Your Honor.

25      THE COURT:  And are you in full agreement with

1  his withdrawal of the objection that was lodged

2  originally?

3         THE DEFENDANT:  I am, Your Honor.

4         THE COURT:  And are there any remaining

5  objections that you have to the contents?

6         THE DEFENDANT:  No, Your Honor.

7         THE COURT:  Thank you.

8         The presentence investigation report yields a

9  total offense level of 25 with a Criminal History

10  Category of I.  The statutory provisions for

11  custody on Count I is a sentence of up to 20 years;

12  Count II, a sentence of up to 10 years.  The

13  advisory custody guideline range is 57 to 71 months

14  in prison.  The statutory range for supervised

15  release is up to three years on each count, and the

16  advisory guideline range is one to three years on

17  each count.  The guidelines make him ineligible for

18  probation.  The statutory provision allows for one

19  to five years of probation.  The statutory fine on

20  Count I is up to $250,000, and the statutory fine

21  for Count II is $3,447,213.  The advisory guideline

22  fine range is 20,000 up to the $3,447,213.  The

23  restitution in this case appears to be agreed upon

24  at the amount of $1,723,606.27.  And there is a

25  $100 special assessment on each of Count I and

1  Count II.

2      Does the government concur with the Court's

3  recitation of the statutory as well as the advisory

4  guideline range?

5      MR. ALLEGRO:  Yes, Your Honor.

6      THE COURT:  And Mr. Beckett?

7      MR. BECKETT:  Yes, Your Honor.

8      THE COURT:  All right.  The Court will adopt

9  the revised presentence investigation report and

10  its contents, and they'll be made part of the

11  record.

12      Mr. Allegro, does the government have any

13  evidence in aggravation that they wish to present?

14      MR. ALLEGRO:  No, Judge, just, as I indicated,

15  we have some victims who would like to allocute.

16      THE COURT:  Okay.  Let's go ahead and do that

17  now.  Which -- do you have the order?

18      MR. ALLEGRO:  Mr. Mangieri?  Right this way,

19  sir.  Speak into this microphone and make your

20  statement.  I'm not going to examine you.

21      THE COURT:  Okay.  Mr. Mangieri, could you

22  spell your name for the record, please?

23      MR. MANGIERI:  Sure.  It's Peter, P-e-t-e-r,

24  J. as in Joseph, Mangieri, M-a-n-g-i-e-r-i.

25      THE COURT:  Okay.  I just ask that you speak

7

directly into the microphone so we can hear you.
And you may begin when you are ready.

MR. MANGIERI:  Okay.  Your Honor, what I'm
going to read is -- it's a two-page kind of summary
of my relationship with Todd, how I got to --
introduced to him, the impact on my life and what
my takeaway from this was supposed to be.  And I'll
start reading.  Okay?

THE COURT:  Can you just pull the microphone a
little bit closer to you?  Thank you.

MR. MANGIERI:  All right.  And I kind of need
cheaters, but I'll do the best I can here.

I would like to read my thoughts and comments
regarding Todd Raufeisen, how he took advantage of
my family and a substantial amount of its capital
reserve.

Our relationship goes back to roughly late
September 2013 when Scott Pepper of Pepper
Construction called me and asked if I would be
interested in a Hampton Hotel project in Galesburg.
He noted the developer was Todd Raufeisen of RDC,
and by all their research, he seemed to be a
reputable developer.  The reason Pepper was not
going to get involved with Mr. Raufeisen was that
Pepper did not want to invest a half million

1  dollars into a development project and become a

2  partner in the hotel.  That's why Scott called me

3  and knew I was into development and a construction

4  manager, and I would be interested in looking at

5  both ends of this project.

6      From there I continued -- I contacted my

7  attorney, Troy Pudik of Elias, Meginnes & Seghetti.

8  Troy looked at this deal, over along with

9  Mr. Raufeisen's attorney at the time, Chris Oswald

10  from Miller, Hall & Triggs, both very reputable

11  firms in Peoria.  The vetting process took place

12  for about three weeks and -- or so, and in the end,

13  the development project passed all the smell tests.

14      So, my family invested a half-million dollars

15  from our 1420 West Pioneer Park, LLC, of which my

16  wife and I are 60 percent owners and our children

17  are 40 percent owners.  The agreement was for us to

18  extend -- extend a half-million-dollar loan of

19  which -- which what was drawn up by our attorneys,

20  and Mangieri Companies would build the Hampton

21  Hotel.  The loan was to be paid back in 36 months

22  and had a 9 percent interest paid quarterly

23  attached to it.  The loan was also to be tied to

24  1-1/2 million dollars of Mr. Raufeisen's personal

25  financial statement, of which he signed and gave us

1  a copy.  And I have that with me as well.

2      At the time, his PFS was valued at roughly

3  $8.8 million, and one asset had a note -- he had

4  noted was a farm his wife inherited worth roughly

5  $2.47 million, a lake property in both names worth

6  3.25 million -- or, excuse me, $325,000, a TT trust

7  worth $425,000 and a Barstow RDC worth 303,985.

8      To date, we have not paid -- we have not been

9  paid our regular interest payments, the first one

10  which was timely, the second one which was not, and

11  from there it has been nothing short of a

12  nightmare, not only to my family but my business.

13      Your Honor, my family has built its -- has

14  been built over the years on integrity, hard work,

15  trust and simple pleasures.  Now that I look back

16  over the past three years, Mr. Raufeisen had played

17  me like a fiddle -- me and my family like a fiddle,

18  never once being truthful but sounding very

19  convincing.

20      During this time, the following has occurred:

21  He said his wife was diagnosed with Stage 4 ovarian

22  cancer, of which she has since beaten completely.

23  He noted her grandmother and her mother both died

24  of ovarian cancer, and her recovery was nothing

25  short of a miracle, so God bless her.  I hope that

1   she doesn't ever get that deadly disease back again
2   in her life.  I was pleased to hear of her recovery
3   but became skeptical since it was diagnosed as
4   Stage 4 and how quick she recovered.

5       I began to think maybe the first few interest
6   payments were made from my own investment when this
7   development began to stall.  Mr. Raufeisen was very
8   good at making you believe everything was going to
9   be -- was going to get done, and it never did.

10      Mr. Raufeisen had me budget several other
11  projects, one in Monmouth -- or, excuse me, one in
12  Macomb and Bloomington, Illinois, of which never
13  took off.  They were also -- there were also a few
14  other hotels in Iowa and Wisconsin that were
15  promised to Mangieri Companies along the way.  We
16  were also told we would be reimbursed for our
17  estimating services.  I found myself in a very
18  difficult discussion with the landowners in
19  Bloomington and the buyer of that same land; that
20  project is currently in court.  I was to build a
21  strip center, and that is now tied up in court
22  between the owner and the purchaser of the land.

23      Mr. Raufeisen had some golf course tax credits
24  he was trying to sell, and he had repeatedly told
25  me he had multiple buyers, the biggest one being a

casino buyer and that -- and the beat went on with
the tax credit play, only to find out he didn't own
the golf course.  According to one source, he owned
1 percent of the course.  He promised there was
enough money in that deal to get me paid back.

Mr. Raufeisen is apparently on the winning
side of a lawsuit with the Quad City Airport
Authority.  He has promised payback as soon as that
is done.

The very last straw was back in November 2016
when Mr. Raufeisen sent me an email saying, and I
quote, "I would like you to take your debt and
invest it as" an equity as it -- "invest it as
equity in a pro-rata basis for equity in the hotel
and the ability to build the hotel at a
cost-competitive level," end quote.  I was sucked
into his charm for way too long to go down that
path.

As a result of my relationship with
Mr. Raufeisen since November 2013, these are the
things that have happened to me in my life:

My family is wondering when and how
Mr. Raufeisen will pay over a half-million-dollar
loan back with interest.  The value of the -- the
value of this court date is roughly $680,000 with

1  interest owed to my family and me.  That is

2  $272,000 to my children and I have -- that I have

3  taken from my children's trust.

4      My business is closed, as of January 1st, as a

5  result of this deal and the chasing I did to align

6  my company with his empty promises of other work.

7  I went from an office of 12 employees to nothing in

8  a matter of 36 months.  This does not count the

9  countless estimating hours we have placed in his

10 behalf to see if his development promises would

11 come to fruition.

12     At the time I wrote this, I was missing my

13 son's Missouri Valley Baseball Tournament in

14 Missouri state as a result of a different hearing.

15 This is something that is priceless to me, and no

16 one can place value on it.  If Mr. Raufeisen was an

17 honest person, I would not be here today.  Knowing

18 that I am -- knowing what I know, I feel like I

19 have supported Mr. Raufeisen and his family with

20 the half-million-dollar loan.  It should have been

21 just -- it shouldn't have just disappeared.

22     At this time, I'm demanding a repayment with

23 interest.  I seriously doubt that I will get that.

24 It is shameful for me to know Mr. Raufeisen has no

25 intentions of investing my family's half-million

1  dollars in his hotel development project.

2      I honestly do not know how Mr. Raufeisen got

3  to this point in his life or his career.  My family

4  -- and it sounds like many others -- have been

5  victimized by Mr. Raufeisen, and I feel he should

6  make good on his paying back his financial debt to

7  our family based on the agreement.  His personal

8  financial statement was to be tied to this loan, no

9  different than if I were a bank and would require

10  me or anyone else to make that same requirement of

11  payback.

12      I went from a proud business owner and a

13  pillar of our community of Peoria to a guy working

14  out of his basement, trying to make sure nothing

15  else happens to our family's possessions.

16      My very last comment is, Your Honor, as a

17  result of this dealing with Mr. Raufeisen, I no

18  longer have the ability to trust anyone outside of

19  my immediate family.  Maybe more than the money,

20  this is something that has been instilled in my

21  family for generations, and that, too, now is gone.

22      I apologize for the emotion.

23      But I was raised -- I'm one of 12 children,

24  and I was raised in Abingdon, Illinois, and my

25  parents were born of immigrants, and trust and

1    honesty and integrity and character was what we

2    built our family on.  And in 36 months, one

3    gentleman just absolutely ripped it out of my gut.

4    And I'm a 60-year-old man -- well, 58-year-old man

5    and was a proud business owner, served on many

6    boards, and I can barely hold my head up in my

7    community because I got nothing to show for it at

8    the moment.

9         Thank you.

10        THE COURT:  Thank you, Mr. Mangieri.

11        MR. ALLEGRO:  Mr. Cameron?

12        THE COURT:  Good morning.

13        MR. CAMERON:  Good morning.

14        THE COURT:  Could you please tell me your name

15   and spell it for the record?

16        MR. CAMERON:  Yes, Your Honor.  My name is

17   Duncan Cameron, D-u-n-c-a-n, middle initial J.,

18   last name Cameron, C-a-m-e-r-o-n.

19        THE COURT:  Thank you.

20        You may begin when ready.

21        MR. CAMERON:  Thank you.

22        Your Honor, this morning is a sad day, and

23   especially after hearing the testimony that I just

24   heard.  I know how stressful this whole episode has

25   been on me and now I can see on others who have

1    mistakenly loaned Todd Raufeisen money.

2         In my case, I invested money with

3    Mr. Raufeisen and his development company with the

4    goal of building a college education fund for the

5    benefit of my nine young grandchildren.  With that

6    serious goal in mind, my accountant and I were very

7    thorough in our due diligence.  We did not regard

8    this as a whimsical investment by any means.  We

9    carefully looked at all the information we could

10   find.

11        To convince us to go forward with an

12   investment in his company, Mr. Raufeisen presented

13   a contract to my accountant and me.  This contract

14   offered the guarantees of two very successful

15   businessmen from downstate Illinois, the Mann

16   Brothers.  Said guarantees assured me of the

17   financial performance of Mr. Raufeisen.  Little did

18   I know that Mr. Raufeisen forged the signatures of

19   the Mann Brothers.  This was not an innocent

20   mistake on Mr. Raufeisen's part.  This was an

21   intentional act that he did with the knowledge that

22   it was wrong and the knowledge that it would,

23   obviously, lead me to make an incorrect assumption.

24        In the months that passed from my initial

25   investment, Mr. Raufeisen never repaid me any

1  money.  In asking Raufeisen to perform under the
2  terms of our written contract, he always offered an
3  excuse why he didn't pay.  These excuses included
4  blaming local banks, citing family illnesses,
5  waiting for relatives to loan him money, needing
6  money for other big property developments,
7  et cetera, et cetera.  At no time, though, did
8  Mr. Raufeisen ever tell me he couldn't pay me.  At
9  no time did Mr. Raufeisen apologize for not living
10  up to his contractual obligations.  At no time did
11  Mr. Raufeisen admit to making any mistake,
12  intentional or accidental.
13       Judge Darrow, this is not just about the
14  money.  I presume all of Mr. Raufeisen's victims
15  have suffered the kind of stress and anxiety that I
16  have been going through since we started learning
17  of his fraudulent activity.  I've always believed
18  that, as a man of my word, I can and should be able
19  to rely upon the word of my fellow man.  In many
20  years, I have chosen to trust those who look me in
21  the eye and give me reasons to trust them.
22  Raufeisen looked me in the eye many times; and
23  instead of acting with good faith, he handed me
24  what I now know to be promissory notes with forged
25  signatures.  I pride myself on being a pretty good

1    judge of character, but despite that, I know now

2    that I have been taken by Mr. Raufeisen.

3         This has taken an emotional toll on me and my

4    family, and no matter what kind of restitution

5    might be available, I cannot ever get back the time

6    and energy and effects this stress has caused.  I

7    will certainly have to think twice if I am ever

8    approached again about loaning someone anything, no

9    matter how legitimate the circumstances might be.

10   This whole episode has affected me in a way I never

11   anticipated or wondered -- or wanted.

12        In summation, Mr. Raufeisen cheated me out of

13   $200,000 that I wanted to see grow for the benefit

14   of my nine grandchildren's college education.  I

15   can sure -- I can certainly appreciate how much

16   stress and anxiety Mr. Raufeisen's actions have

17   caused me and my family, and I hope you can

18   appreciate that.  That's why I am urging you, Judge

19   Darrow, to sentence Mr. Raufeisen to the maximum

20   sentence allowable.

21        Thank you.

22        THE COURT:  Thank you, Mr. Cameron.

23        MR. ALLEGRO:  Thank you, Mr. Cameron.

24        Mr. Hudgins.

25        THE COURT:  Good morning, sir.

1      MR. HUDGINS:  Good morning.

2      THE COURT:  Will you please state your name

3  and spell it for the record?

4      MR. HUDGINS:  My name is John Joseph Hudgins.

5  That's spelled H-u-d-g-i-n-s.

6      THE COURT:  All right.  You may begin when

7  ready.

8      MR. HUDGINS:  Just one second, please.

9      I didn't know if I could make this trip, and

10  after hearing the people before me, I can tell that

11  I'm not the only one.  I took off work yesterday to

12  drive up; it seemed like it took forever.  I do

13  appreciate the opportunity that our justice system

14  allows us to have this opportunity because I feel

15  like I need to be here.  I think other people feel

16  the same.

17      There are things that need to be said.

18  Countless hours have been spent by the Attorney

19  General's Office, the Illinois Secretary of State,

20  this Court, the probation office in Peoria, the IRS

21  to get to this point with Todd, but there are

22  things that the Court probably doesn't know fully

23  because interviews and reports can't fully convey

24  what has happened, although you are starting to get

25  a sense of that now.

1       So, I'm here to try to provide some of the
2   social context and the human element of this story
3   because it's not just business fraud; there are
4   people involved, and, as you can tell, there are
5   lives involved, too.

6       Todd and I go way back.  At points in life we
7   were very close.  And as many of us were, we knew
8   his parents, his sister, his brother-in-law well.
9   We share many common memories, which that's
10  probably why more people aren't here today to speak
11  towards this.  It is hard; very hard.  When I have
12  to see his family sitting there and say what I have
13  to say, it's hard, but it needs to be said.

14      So, I entered into an agreement with Todd to
15  invest in Todd's company.  These facts that I've
16  heard before me are exactly what I've had, too.
17  And with any investment you enter knowing there is
18  a risk.  There was no idea of grandiosity.  We
19  weren't trying to hit a home run and make a
20  boatload of money.  We weren't trying to do
21  something on the sly.  This was part of an
22  investment portfolio, and it looked like it was
23  investment.

24      I had people to say me, How could you have
25  ever gotten involved with Todd?

1    Well, friendship -- it starts with friendship.

2  And I did my research; I just didn't do enough.

3  And then this is where the human element of all

4  this comes in.  He was my friend, and I just had

5  seen him preside as a chairman of the John Deere

6  Classic.  I stayed in one of his hotels.  I visited

7  his magnificent home.  And I knew -- you know, I

8  knew of his multiple DUI convictions.  I didn't

9  know about his house being foreclosed on.  I'm much

10  more savvy now to how all this stuff works.  But

11  that's hindsight.  And at that time, he hadn't been

12  in the news with all of his problems with the city

13  or Fyre Lake or Sherrard.  And so then when you're

14  presented with fraudulent, signed personal

15  statements, fictitious business partners who are

16  legitimate, and forged promissory notes, that's how

17  you get duped.

18    So, Todd designed his lies to be believable,

19  and he designed his fraud to fit perfectly of our

20  assumptions of him.  So, I entered into this

21  agreement to invest, but it was not an investment;

22  it was a Ponzi scheme and a way for Todd to support

23  his family and live this life-style that he has

24  chosen to live.

25    And he fabricated this deceit methodically,

1  willingly and with no remorse.  You've heard it

2  from the people who have just preceded me.  I am

3  not the only one.  It's the same story.  He put a

4  lot of time into deceiving us.

5      So, here's an example of it.  And I did -- I

6  do not know any of these other people that have

7  come up before me.  We and this other group of

8  people who -- of close friends that he approached

9  with this, once we smelled a rat, we went looking

10  for it.  And we called him on the fact of the

11  discrepancies in his story, and we said, "We'd like

12  to talk to the Manns.  Where do they come in here?"

13      And Todd said, "Let me arrange a conference

14  call for you."

15      This is my brother doing this.  And so my

16  brother and Todd and purportedly the Manns had a

17  conference call.  And afterwards, it just didn't

18  sit right with my brother, didn't sound kosher.

19  So, he looks into it.  A couple days go by, and it

20  just became more unsettling, and more lies and

21  fabrications come about.  So, my brother calls the

22  Manns up -- finds their number and calls them up.

23  And in this conversation, he realizes that the

24  Manns have -- don't know anything about this

25  conversation.  They're unaware of it.  They're not

1  partners, lo and behold, of Todd.  Their signatures
2  have been forged.  And so -- but my brother said,
3  "I just spoke with you two days ago."
4      And they said, "You did not."
5      So, you know, Todd, what did you do?  Did you
6  hire people to be the Manns?  Did you disguise your
7  voice -- because it was a bad connection -- and act
8  like the Manns?  That's unbelievable --
9  unbelievable -- to friends, to long-time friends.
10      It's just one fabrication and lie after
11  another.  And all the while, he is living the good
12  life on someone else's money.  There's much more to
13  tell.  All of this is firsthand.  You're -- you've
14  heard it.  You're going to probably hear some more,
15  but you get the picture.
16      What bothers me the most is that when we
17  confronted Todd with this, that the gig is up and
18  said, "You must quit," he continued to deny,
19  side-step and conceal what he'd done.  Worse, he
20  continued to pursue other friends of ours.  We
21  said, "Todd, you gotta quit this.  Quit going after
22  your friends.  This is over."  And yet he still
23  went after them.  He wanted to continue the Ponzi
24  scheme.  There's no remorse.  There's no shame.
25  And I think that's highly important to know.  I

have no doubt that Todd would still be stealing and
defrauding from whoever he could if we and the rest
of you did not discover his lies.  I know it.

     And I can tell you that after knowing Todd
these years that he is not sorry.  I hate to say
this, but he is not sorry.  Not in the least.  He
will never change because he's always been like
this, this BS artist.  It went from little deceits
and minor connivances to now it's just outright
criminal behavior.  And I can tell you that he's
not -- what he's not become and that is sincere and
changed or truthful.  At this point, he's just
trying to save his own skin and his criminal
attorney to write us letters of apology.  He would
have never done that.  It was said before, he's
never apologized.  He has never owned up to this.

     The argument that he cannot earn money in
prison is without merit and, more importantly, does
not speak to the point today.  He makes money now,
I think around 144,000 a year.  He lives in a huge
home, and his mortgage is eating him alive.  All
along, he could have changed his life-style.  He
could have started paying us back.  No, none of
that.  Instead of working like the rest of us, he
realized his forte was fraud and deception, and

1   this is what he specialized in, not real estate

2   development.  No one in their right mind would ever

3   do business with him again.

4        And this claim that he got caught up in the

5   great recession, that's just a convenient excuse.

6   His bad deeds and poor business acumen started way

7   before that.

8        Todd has admitted guilt, and there's no

9   mistaking he's guilty, but most importantly to you,

10  Judge Darrow, is that he's committed fraud by wire

11  and money laundering.  Contract law is what our

12  economy is based on.  We get upset when laws are

13  broken.  They exist so we can operate truthfully,

14  and the rules of law address the systems of

15  redress.  What he did to his long-time friends is

16  another level of impropriety that you cannot

17  address, but it can certainly speak to the

18  narrative when you go to sentence him.  It speaks

19  to his complete lack of character and to the type

20  of person that he truly is -- and it's a cheat,

21  it's a liar, it's a sociopathic person and a thief,

22  and I say this with the utmost sincerity and the

23  perspective of a long-time friend.

24        THE COURT:  Thank you, Mr. Hudgins.

25        MR. HUDGINS:  If it would please the Court, my

1   brother, who is also a victim, has written a

2   statement.  He lives in Boston and is unable to

3   come.  Would I be allowed to read a statement from

4   him?

5       THE COURT:  You may.  What is his name, and

6   spell it for the record.

7       MR. HUDGINS:  His name is Jem Hudgins.  That's

8   spelled J-e-m and H-u-d-g-i-n-s.

9       So, this is from my brother Jem:

10      I would like to be here in person to testify,

11  but spending any more of my time and money related

12  to Todd Raufeisen doesn't seem to be the fair thing

13  to do to my family.  However, I would like to give

14  you a few thoughts on Todd.  I've spent countless

15  hours communicating with him over the past three

16  years and feel completely confident he has little

17  remorse for what he has done.  He is a pathological

18  liar and an egomaniac.  There is no doubt he's

19  going to tell the Court that he has a plan to pay

20  everybody back, just needs the time to implement

21  it, and this means spending as little time in jail

22  as possible.

23      Over the past years, Todd has presented me

24  with projects that were certain to close, deals

25  with CVS, hotel chains, local and national

1  developers, and they've all proved to be delay

2  tactics and lies.  Three weeks before he pled

3  guilty in May of this year, he told me he was

4  confident he had the conservation easement sold on

5  the Fyre Lake Golf Course, and he was going to earn

6  a fee of 1.5 million and have everyone paid off, a

7  story -- a story that he has repeated monthly for

8  almost two years.  He simply can't separate the

9  truth from his illusions of grandeur.

10      Now he is touting a plan to develop Starbucks

11  sites, and this will be the answer.  I can tell you

12  he's been telling me this same story for more than

13  a year and a half, even assuring me several deals

14  were signed.  If he actually did close one of them,

15  he certainly did not use the money to pay any of us

16  back.  Todd has had over seven years since he

17  started criminal activities to do the right thing

18  but has consciously chosen to continue defrauding

19  new investors.  At this point, the line between

20  truth and lying has been become indiscernible for

21  him.

22      I ask the Court not to fall for the same

23  storyline that entrapped each one of us.  It all

24  sounds good -- he's a good liar -- but it's all a

25  dream and a bad one at that.  I would ask you to

1  consider the maximum sentence.  If the sentence is
2  minimal, you have essentially given Todd an
3  interest-free loan and a slap on the wrist, not a
4  deterrent for him or any other criminal-to-be.

5      I could spend pages and hours telling you the
6  egregious stories he has spun to protect himself
7  instead of facing the truth of his deceit, and I
8  think his family and the Court needs to hear one in
9  particular.  I say this because I still do not
10 believe they really know the story of his actions.

11     And I would agree to that, too.

12     In February 2015, Todd sent me an email saying
13 that he had to take his wife to the Mayo Clinic for
14 the week because she had ovarian cancer.  Over the
15 years when he needed to buy some time on deadlines,
16 these family medical emergencies were common.

17     Another good one was that his -- another
18 often-heard one was that his father was on his
19 deathbed several times.

20     Now, my brother is saying this, and this is
21 true:

22     My brother lost his wife to cancer at age 35,
23 and he had two children under the age of six at the
24 time so I am pretty sympathetic to other people's
25 situations.  What I have come to find out since

1   this story is that Todd actually took his wife and

2   son to Australia for two weeks during this time to

3   visit his daughter who was studying abroad there.

4   There's pictures of drinking, scuba-diving,

5   sky-diving, amusement parks, all on social media.

6   This grand vacation was paid for not by him.  I'm

7   sorry to tell you, your dad was not working hard at

8   making money.  He was working hard at deceit to

9   take his family over there and celebrate the fact

10  that he duped someone else to giving him money.

11      All this money was for my own children's

12  college education.  If this type of behavior

13  doesn't demonstrate what type of person he really

14  is, I do not know what does.  It's all about him at

15  the cost of everyone else.  At this point, I

16  personally know dozens of other people that were --

17  he had tried to contact to entrap in his Ponzi

18  scheme.  Thankfully, they had not the foresight to

19  fall into it.  His actions need to be punished with

20  a sentence that is fitting of this deceit.

21      Thank you.

22      THE COURT:  Thank you.

23      Are you aware of any other victims that wish

24  to be heard, Mr. Allegro?

25      MR. ALLEGRO:  I am not, Your Honor.

1      Are there any other persons on the list of
2  victims entitled to restitution who wanted to
3  speak?
4      Can I have a second, Your Honor?
5      THE COURT:  You may.
6      (A pause was had in the record.)
7      MR. ALLEGRO:  Judge, this is Mr. David
8  Werning.
9      THE COURT:  Thank you.  Good morning.
10      MR. WERNING:  Good morning.
11      THE COURT:  Could you state your name and
12  spell it for the record, please?
13      MR. WERNING:  David Werning, D-a-v-i-d,
14  W-e-r-n-i-n-g.
15      THE COURT:  You may begin when ready.
16      MR. WERNING:  You know, I fully understand and
17  appreciate the comments and the anger and
18  frustration that I've heard this morning.  My
19  experience with Todd is different than that, and
20  that's not meant to refute anything that's been
21  said this morning.
22      I invested in Fyre Lake Golf Course with Todd
23  Raufeisen.  All the money that I was -- that I gave
24  to Todd I strongly believe and am confident went to
25  Fyre Lake Golf Course for the purchase of the golf

1  course as well as the ongoing operations of the
2  golf course.

3      Reference has been made today about the
4  conservation easement and the selling of the
5  conservation easement.  It's not -- the money that
6  I gave to Todd, I had the clear understanding that
7  I would not receive anything back from that
8  investment until the golf course was sold.  I was
9  in direct communication with Todd the entire time
10 when he was trying to sell the golf course.  The
11 numerous people that he contacted I was aware of,
12 had conversations with several of them, and I
13 understand the difficulty of selling the golf
14 course.  Believe me, I became actively involved in
15 it also and tried to sell the golf course.  It
16 wasn't a simple sale of a golf course because of
17 the tie of the conservation easement which provides
18 tax deductions.  So, as much as it was a sale of a
19 golf course, it was much more of a sale of a
20 conservation easement for the tax deductions.  That
21 complicated things significantly.

22     The golf industry is not an easy one these
23 days.  More golf courses are closed than opened in
24 any given year for about the last ten years.  So, I
25 understand I probably made a bad decision in

investing in the golf course with Todd.  I've made
bad decisions on stocks that I've bought before and
lost money.  So, I understand nobody likes to lose
money.

My understanding and my belief is that Todd
did exactly what he promised to do and worked
diligently on it; and if the golf course would have
been sold, I would have had a return on my
investment.

I have confidence -- continued confidence in
Todd, and that's demonstrated by the fact that I
have entered into an agreement to develop -- Todd's
the developer on a Starbucks property in Dubuque,
Iowa.  It's scheduled for completion the 6th of
October to turn it over to Starbucks.  Everything
has been handled professionally, diligently, and I
believe, through communication with Starbucks, that
Starbucks is happy with him.  If available, I
intend to do additional Starbucks projects with
Todd.  Again, that's certainly dependent on his
availability to continue doing work.

I think all of us would like to get our money
back.  I understand Todd misled some people, from
what I've heard today.  I believe everybody would
be extremely happy if they had their money returned

 1    to them.  I believe the only way that's going to

 2    happen is if Todd is gainfully employed.  He's

 3    demonstrated the ability to develop these

 4    Starbucks, and if he continues to have the ability

 5    to -- availability to do that, I think that is one

 6    of the only ways that people will get a return on

 7    their investment.

 8         So, I'm moving forward with Todd, if that's a

 9    possibility, and hopefully he will be given that

10    opportunity.

11         Thank you.

12         THE COURT:  Thank you.

13         MR. ALLEGRO:  This is Mrs. Michael Thoms.

14    Michael Thoms is one of the folks on the list.

15         THE COURT:  Good morning.

16         MS. THOMS:  Good morning.

17         THE COURT:  Will you please state your name

18    and spell it for the record?

19         MS. THOMS:  Sara Thoms, T-h-o-m-s.

20         THE COURT:  You may begin when ready.

21         MS. THOMS:  My husband is Mr. Michael Thoms,

22    and he's away today on City business; and I'm

23    afraid he does know more about the interlockings of

24    these business deals with Todd than I do, but I can

25    speak on an emotional level here.  And it's been a

1    quite emotional ride with Todd over the last few

2    years.  And what is very upsetting is he's taken

3    advantage of many of my friends.  And it's funny;

4    I'll be sitting at an event, and the name will come

5    up.  And we are such a good, close community and so

6    trusting that it just started falling together that

7    you've been taken advantage, you've been taken

8    advantage, you've been taken advantage, and it's

9    been a very -- it's, it's -- it's been upsetting.

10   And it's been upsetting to my husband; I think he's

11   suffered health-wise because of Todd.  He's a very

12   trusting man.

13       We did purchase the golf course, which has

14   been a nightmare.  Everything we -- you know, we

15   buy a golf course, and we find everything is

16   overmortgaged and that -- but again, I don't know

17   the ins and outs of Michael's -- the dollar value,

18   but all I do know is it's been an emotional ride

19   for my family, my friends, this community, and it's

20   -- I find it -- it's -- I just -- words can't say

21   how upsetting and disappointed I am in this

22   gentleman here and his wife and how they paraded

23   around town saying, you know, and belonging to --

24   showing up at the golf tournaments and showing up

25   at social events with their heads held high.  And

1   they -- they've screwed us all, and I'm -- that's

2   how I feel, and I just felt I had to say that.

3        And that's all I have to say.

4        THE COURT:  Thank you, Miss Thoms.

5        Do any other victims wish to be heard?

6        MR. ALLEGRO:  That's all.

7        THE COURT:  All right.  Thank you.

8        Mr. Beckett, on behalf of Mr. Raufeisen, do

9   you have any evidence in aggravation you wish to

10  present other than the letters that were attached

11  to the sentencing memorandum which I have reviewed

12  and then including the one that was filed late

13  yesterday from Ms. Barrett?

14       MR. BECKETT:  That's the mitigation we have,

15  Your Honor.

16       THE COURT:  Okay.  Thank you.

17       At this time I'll entertain commentary on

18  sentencing factors and the government's recommended

19  sentence.

20       MR. ALLEGRO:  Thank you, Your Honor.

21       As several of these victims indicated, this is

22  a very emotional case, Judge.  And this is not

23  about the money.  One of the victims -- Mr. Werning

24  who spoke -- seemed to be talking about the money,

25  but this is not -- this is not about money.  And I

1   think there are people -- maybe even some of the

2   people in this courtroom who misunderstand the role

3   of the United States Attorney's Office, the FBI,

4   the IRS CID and the Illinois Secretary of State's

5   Office who worked this case.  We are not a

6   collection agency for people who were injured,

7   defrauded, victims of thefts.  We are here to

8   represent the people of the United States of

9   America and see that justice is done and people are

10  held accountable for what they have done.

11      This is one of these situations where, you

12  know, it kind of puts our justice system on the

13  skyline.  Does the justice system work?  Is there

14  going to be accountability?  You know, getting

15  money back -- if we ever got any money back in this

16  case, I would be surprised.  But this is about

17  holding somebody accountable for what has been a

18  six-year-long series of lies and fraud of a good

19  cross-section of the community.

20      The Court has the PSR.  The guidelines are

21  undisputed.  The government is asking for a

22  guideline sentence anywhere within the --

23  recommending a sentence anywhere within the

24  guidelines that the Court thinks appropriate.  But

25  this being a white-collar case, we always have the

1    same boulder to push uphill and that is you have a

2    gentleman here who led what appeared to be or was

3    otherwise a law-abiding life.  And then all of a

4    sudden, it's discovered that he is engaged in

5    fraud.

6        And we always get the argument or the

7    underlying theme, the underlying feeling -- even if

8    unspoken -- that, well, you know, this is not such

9    a bad guy; he just went wrong, out of his

10   character, that kind of thing.

11       And so I'm going to address some of those

12   issues and some of the things that are raised in

13   the letter and in the defendant's sentencing

14   commentary that are all along those lines.

15       And one of the things that was stated in the

16   defendant's sentencing commentary, the defendant

17   said that he needed the money for the development

18   projects to succeed and to support his family.  And

19   let me talk about the family issue first.  As

20   several -- a couple of the victims anticipated me,

21   this was just maintaining a very high-living

22   life-style.  This was not supporting your family in

23   the sense of buying vegetables, fruit, bread and

24   milk for your family to eat or putting a roof over

25   their heads.  This was putting them in a very

1  high-level residence, allowing basically a luxury

2  life-style so -- and that's what Mr. Raufeisen --

3  why Mr. Raufeisen was stealing this money, to

4  maintain this illusion that he was at the upper

5  levels of Quad Cities society, and he was chairman

6  of the John Deere Golf Classic and so forth and --

7  but this was all -- this was not for survival.  You

8  know, at any point in time if Mr. Raufeisen's

9  business started going bad, all he had to do was

10  say, you know, a couple of different things:  Close

11  up his business and say, "You few people I owe

12  money to, I'll pay you back.  I'm going to get a

13  job."

14      My understanding -- I read somewhere, I think

15  Mr. Raufeisen has a degree in engineering from the

16  University of Illinois.  Well, my -- I believe

17  that's correct; I'm sure Mr. Beckett will correct

18  me if I'm wrong.  My understanding is engineers are

19  pretty employable people.  Mr. Raufeisen could have

20  got a job.  He could have started paying people

21  back.  He could have moved his family out of his

22  overmortgaged house into a rental or a condo -- a

23  rented condo or something like that, but he just

24  chose not to do that.  He just chose to fund this

25  family's life-style by stealing.

1    And the thing that's -- the statement that he
2  needed it for his development projects, again, he
3  didn't -- he didn't need the money for his
4  development projects.  He needed the money to give
5  the illusion that he was a big-time real estate
6  developer.  All he had to do was close up his
7  business or declare bankruptcy or whatever the
8  normal remedy would be if you owe more money than
9  you can pay and, and then try to pay people back
10  later.  He didn't do any of that.  And why, we
11  don't know.  I mean, I'm not -- you know, somebody
12  called him a sociopath.  Based on the record we
13  have before us, six years of continued lies, not
14  just the initial frauds, presenting forged
15  promissory notes, you know, saying that the Manns
16  are his partners, getting the money and then, you
17  know, spending it on, on family expenses.  This is
18  just a continual set of lies.  Somebody called them
19  delaying tactics.  You know, "I'm going to the Mayo
20  Clinic," one of the victims said, "so I can't pay
21  you back."  You know, the excuses that, "The bank
22  wire didn't go through because I missed a deadline.
23  The dog ate my check," whatever.  All those kinds
24  of excuses for years, and he didn't pay these
25  people back.

1       Mr. Werning talks about, you know, the money

2  and his investment, and he thinks he'll get it back

3  or whatever if he invested it in these other

4  things.  Well, I mean, this was more than just

5  about money.  This is about lying.  You know, you

6  get on the phone and you pretend to be somebody

7  else or you get somebody else -- persons unknown --

8  to pretend to be your partners and speak to a

9  victim to deceive him.  I mean, that's pretty much

10  outside the norm.

11       This is -- you know, often we talk in these

12  white-collar cases about all the reasons why this

13  case is or is not outside the heartland in terms of

14  going below the guidelines.  This case is almost

15  one like, boy, there's a lot of aggravated behavior

16  in this case that almost calls for more.  But we're

17  not asking for that; we are calling for a guideline

18  sentence because we think the Sentencing Commission

19  knows what it's doing, and this case is at least

20  squarely within the guidelines, if not higher.

21       I am not a psychologist.  I don't know why

22  Mr. Raufeisen did this.  I don't know if he's a

23  sociopath.  It's clear, though, he didn't do it

24  just because he got in a jam and the great

25  recession and his business went down, you know, had

1  a dip, and he had to start, you know, using money
2  from this investment to pay off the last.  That
3  clearly is not the reason he did it, and it clearly
4  was not to support a -- support his family in terms
5  of feeding them and putting a roof over their
6  heads.
7      The other argument -- one of the other
8  arguments we always get -- which isn't stated, I
9  think, explicitly in the letters or the defendant's
10  brief, but it's the kind of catchall for some of
11  the statements that are made here is that, "This is
12  out of his character.  He's not really like that."
13      Well, no, this was Mr. Raufeisen's character
14  or it became his character at some point around
15  2010 because he did this from 2010 until 2016.  And
16  like I indicated, this wasn't just one lie per
17  victim; this was just a series of lies and delays
18  and reasons why I can't pay you and so forth.  And
19  they were lies; they were not the truth.
20      You know, we get this assertion in the
21  letters, well, his community involvement and his
22  charitable activities.  Maybe I'm a cynic, but it
23  appears to me that Mr. Raufeisen was doing that
24  simply for business.  Mr. Raufeisen was a real
25  estate developer; he apparently thought his best

1  marketing tool was to raise his profile in the
2  community, and he did.  He made himself, in the
3  Quad Cities, a public figure.  That's one of the
4  reasons we have so many people in this courtroom,
5  we have the news media reporting on this case
6  because he made himself a public figure.  And he
7  raised his profile, and he did this with his
8  charitable activities, his picture in the
9  newspaper, John Deere Classic.  We have all kinds
10  of pictures in our investigative file of
11  Mr. Raufeisen schmoozing with, you know, the
12  hoi polloi of the Quad Cities and that, I'm sure,
13  did help his business and subsequently helped him
14  cultivate more victims, of course.  But this was
15  not because of, I would suggest, because of a
16  charitable impulse; this was part of his business.
17      Now, another argument we see in the letters
18  and in the brief is that he stole $1.7 million
19  because he was under great financial pressure.  And
20  we get that great financial duress, quote-unquote,
21  from Didier Glattard and James Derry.  We get,
22  quote, harmful business decisions.  Somebody -- I
23  think the principal.  The letter that came in this
24  morning, the school principal said he made some
25  harmful business decisions.  This wasn't harmful

1  business decisions; this was a pattern of fraud,

2  deceit and then covering up that just went on for

3  six years.

4      And as I believe -- I believe it was

5  Mr. Hudgins said this would still be going on.

6  This would still be going on if it had not been

7  discovered by some of the victims, and lawsuits

8  started sprouting up; and then these gentlemen

9  became aware of it, and we opened the criminal

10  case.

11      There's this -- several statements here about

12  Mr. Raufeisen being otherwise, you know, a good

13  person and honest and that kind of thing.  I mean,

14  you heard Mr. Hudgins; he knew him a long time; he

15  calls him a BS artist.  Other people in other

16  letters who knew him a long time have said

17  otherwise.  Again, none of us know what's going on

18  inside Mr. Raufeisen's head.  All we have is the

19  fact -- or the facts and the evidence of what he

20  did; and from what he did, I don't think -- or I

21  can't find any explanation for this other than that

22  he is sociopathic in some way or for -- whatever

23  that word means clinically, he is -- he is kind of

24  a serial defrauder and liar.

25      We get the argument in the brief and we got it

1    from Mr. Werning, "Well, gee, he needs to stay out
2    of prison so he can pay us back," or, "We need to
3    minimize the time he goes to prison so he can pay
4    us back."

5         Now, if this was -- Mr. Raufeisen, in a sense,
6    is managing people's investments.  If this was a
7    securities case, he would be barred for life from
8    the security industry.  If he was a banker, he
9    would be barred for life from the banking industry.
10   I looked into barring him from real estate
11   development, but I can't do that because there's no
12   license, and there's no government agency for real
13   estate development.  You're just, you know, doing
14   it on your own; otherwise, I would ask the Court or
15   I would -- I would seek or refer the information to
16   the appropriate administrative agency to seek to
17   have him barred from real estate.  He should not be
18   doing this; he should not be borrowing money from
19   people.  He should not be developing Starbucks.
20   It's just kind of certifiable -- certifiably crazy
21   to put money in Mr. Raufeisen's hands.

22        When Mr. Raufeisen -- if he goes to prison --
23   comes out of prison, he needs to start over again.
24   He needs to get a job.  He needs to provide for his
25   family in a conservative manner within his --

1  within the money that he can earn honestly, not by

2  stealing it and living an illusion.

3      The idea that he's going to pay folks back,

4  there's indications in the PSR that he has some

5  assets.  Well, why aren't -- why haven't they been

6  paid back?  He supposedly has business property

7  that's about to go into contract, quote-unquote, I

8  believe the PSR says.  This -- these gentlemen

9  confronted Mr. Raufeisen a year ago, and

10  Mr. Raufeisen quickly hired Mr. Beckett who, I

11  think, has done everything possible to mitigate

12  this offense.  Why didn't he sell his business

13  property a year ago?  Why didn't he -- he

14  supposedly is in line to get money from a trust

15  fund.  I don't know -- we -- there's no other

16  information there.  I don't know who the trustee

17  is.  Supposedly it's a substantial amount of money,

18  and he has a 50 percent interest.  Why doesn't he

19  have the money?  Why doesn't the trustee give him

20  the money so he can pay these victims back?  None

21  of them have been paid back.

22      According to his cash flow, he's making

23  $144,000 -- that's not counting the small amount of

24  money his wife makes -- a year.  At the rate of

25  $144,000 a year, I think it's $12,000 a month in

1  income.  Half of his income's being spent on a
2  house payment for an underwater mortgage.  There's
3  -- Mr. Raufeisen could have sold his house.  He'd
4  still have some debt from it because he's
5  underwater on his mortgage, but he could have sold
6  his house and moved his family into something more
7  modest, and he could have started paying these
8  people back with part of this $144,000.
9      He's made no effort in that regard, and
10  there's no reason to believe this line that he's
11  going to -- if he stays out of prison he's going to
12  develop all these Starbucks, and everything in the
13  world is going to be right again.  That's just,
14  just not credible.
15      These two new partners here in the Starbucks
16  ventures who wrote these letters on his behalf,
17  well, if they're business partners of his and they
18  believe in him so deeply, why don't they put
19  forward $1.7 million to pay off his debts to these
20  victims and then he can owe that to them?  And then
21  he can work it off by developing these Starbucks
22  properties.  But, you know, that's putting their
23  money where your mouth is, and we don't have any
24  money.  Not one dime has been paid back to these
25  victims even though this investigation -- known to

1  Mr. Raufeisen at least -- has been going on for a
2  year.

3      The kind of sentences we see in these kinds of
4  cases, Judge -- and every case is different, and I
5  am not trying to compare apples and oranges, but, I
6  mean, Mr. Raufeisen stole $1.7 million.  He stole
7  it over a six-year period.  He stole it not just by
8  one lie; he stole it by repeated, repeated,
9  repeated lies and cover-ups and delays.  If
10  Mr. Raufeisen doesn't serve a guideline sentence,
11  what do we tell some guy who, you know, defrauded
12  the Social Security Administration of $50,000 and
13  now he -- you know, he's going to prison for some
14  period of time?  Or I had a case once with a lawyer
15  I prosecuted; and it was different because he went
16  to trial, he didn't get acceptance of
17  responsibility and all that, so I'm not trying to
18  compare cases Mr. Beckett doesn't know anything
19  about, but we've all seen these cases.  He got
20  three years; it was $470,000 in loss.  That's a
21  quarter of what we're talking about here, and it
22  was like a one-time transaction, not six repeated
23  transactions over six years.

24      You know, we have all these other fraud cases.
25  We have tellers who embezzle money from the bank

1   where they work -- 5,000, 10,000, $15,000 -- people

2   who commit Social Security fraud, people who

3   defraud the Small Business Administration, people

4   who defraud the Veterans Administration; we see

5   these people pass through this courtroom.  And if

6   he gets home confinement or a year and a day like

7   he's asking for, how do you fit the rest of those

8   people into that sentencing scheme?  It just --

9   that math just does not work.

10      And the sentencing guidelines in this case

11  adequately put Mr. Raufeisen where he should be;

12  and to the extent they do anything wrong, they

13  really don't take into account the aggravated

14  nature of this offense.

15      Again, this is a public offense.  This is not

16  about money.  We're not here to collect money for

17  any victim.  I am here speaking for the citizens of

18  the United States to hold this man accountable so

19  people have confidence in the justice system, so

20  that they know when their disputes go to court that

21  justice is going to be done.  And justice would not

22  be done in this case, and people would lose faith

23  in the court system if Mr. Raufeisen was given a

24  slap on the wrist.

25      That's all, Your Honor.

1       THE COURT:  Do you have a position on whether

2  or not interest should be waived on the restitution

3  figure?

4       MR. ALLEGRO:  It should not be.

5       THE COURT:  Okay.  And are you seeking a fine?

6       MR. ALLEGRO:  I think he should be ordered to

7  pay restitution in lieu of a fine.

8       THE COURT:  Okay.  Thank you, Mr. Allegro.

9       Mr. Beckett, I'll entertain commentary on

10  sentencing factors and your recommended sentence on

11  behalf of Mr. Raufeisen.

12       MR. BECKETT:  I'll just be brief.

13       THE COURT:  And I will note for the record,

14  again, that I have reviewed the sentencing

15  memorandum, both when it was filed and again this

16  morning in preparation for today's hearing as well

17  as re-reading the letters.

18       MR. BECKETT:  Thank you, Your Honor.  May it

19  please the Court, Mr. Allegro.

20       I want to make sure that the record reflects

21  what I understood the plea agreement to be and I

22  understood from what Mr. Allegro ended with was the

23  government's recommendation was within the

24  guidelines.  Am I correct?

25       THE COURT:  That's my understanding.

1    MR. BECKETT:  Because I heard the government

2 say it almost calls for more, the sentencing

3 guidelines or higher, and that's not consistent

4 with what my understanding of the plea agreement

5 was.  And perhaps it was just part of argument and

6 phrases that got away, but I want to make sure that

7 the record reflects that was our agreement because

8 Mr. Raufeisen did waive appeal, and he did waive

9 collateral attack and that was really the promise

10 that we relied upon.

11    MR. ALLEGRO:  That's correct; that's the

12 recommendation we're making, a guideline sentence.

13    MR. BECKETT:  All right.  All right.  Thank

14 you.

15    We commented on the fact that I withdrew, on

16 Mr. Raufeisen's behalf after discussing with him at

17 length an objection about abuse of a position of

18 trust, and that was the right decision; and I made

19 it after I saw the victim impact statements because

20 before then I really did not get the flavor that

21 you got today.  The victims tell very telling

22 stories.  They were deceived; there's no excuse for

23 the criminal conduct that my client engaged in.  I

24 make no excuse for him, and I don't minimize the

25 effect on those victims.

1        Sometimes, though, when the community talks --
2   as Mrs. Thoms talks about -- there are
3   embellishments.  I heard Mr. Hudgins talk about the
4   many DUIs that the defendant has.  Well, the
5   defendant doesn't have any DUIs.  I think he has a
6   problem with alcohol; I think he's used alcohol as
7   a crutch, and I would hope that would be
8   recognized, depending on if he's on supervision or
9   if he's in the Bureau of Prisons.  But he doesn't
10  have any DUIs.
11       And, you know, he built his house 29 years
12  ago.  That had absolutely nothing to do with what
13  happened in this case, and so the argument about
14  him supporting his family, putting his daughter
15  through college, taking care of a disabled child,
16  et cetera, as if somehow he should apologize for
17  that when he's really doing what all citizens do,
18  which is to try to make the best for their family.
19  That's what Mr. Raufeisen has done.
20       Again, then I hear him called -- that he's
21  clinically sociopathic, but there's no evidence of
22  that.  Those are nice words to throw out there.
23  It's a kind of name-calling.  And I reflect -- and
24  I agree with Mr. Allegro -- that Mr. Raufeisen has
25  no excuse for this.  He's made himself a public

1  person, and now he's here at the public pillory,

2  and everybody's throwing tomatoes, and he doesn't

3  get to throw any tomatoes back.

4      I think that what the victims tell us is that

5  deterrence is an important factor in this case, not

6  just because of this defendant but because of other

7  people who could engage in the same sort of

8  conduct.  That may be the factor that you rely upon

9  most.  It's your judgment.

10     Our sentencing commentary wasn't meant to

11  minimize this and come in and say, "Home

12  confinement's plenty, Judge.  That's what you ought

13  to do."  It's to remind you that there are staged

14  results -- sentencing results within the system

15  depending on your overall thought process of all of

16  the factors.

17     A felony conviction for someone who's a public

18  person stigmatizes, stays with him forever, may

19  prevent him from engaging in his calling even if he

20  can't be debarred, as the government argues.  Home

21  confinement deprives him of his freedom; it may not

22  be enough, but it's an argument that needs to be

23  advocated for you to think about.

24     A year and a day.  Talking about cases, I just

25  saw in the paper yesterday, somebody embezzled

1   $500,000 in Chicago, was in the paper, got a year

2   and a day in federal court.  Okay?  Those are

3   sentences that are used.  I see them over -- I'm

4   not talking about Mr. Allegro's cases; maybe he

5   doesn't know anything about my cases.  I see them

6   used.  Some judges think about that because a year

7   and a day has significance within our system.

8        And ultimately, as we freely admit, you may

9   think this case is too serious, and you think that

10  it is Bureau of Prisons.  We suggest to you that a

11  guideline sentence is -- doesn't have to be.  It's

12  too much.  It's too much.  It's five years.  It

13  literally is five years in the Bureau of Prisons.

14  If we didn't think it was a possibility, would I

15  really say, "And would you consider Terre Haute and

16  Pekin"?

17       So, I've got the government arguing as if

18  we're trying to minimize his conduct.  We didn't do

19  that, Judge.  The best thing Todd Raufeisen did was

20  finally come to grips with his situation.  With my

21  advice, say, Let's meet.  Now it's tell the truth,

22  tell the whole truth.  Tell everybody everything

23  you've done.  Agree with the agents, work with the

24  agents.

25       We met with the agents multiple times; that's

1   what he did.  And the first step towards

2   rehabilitation is to accept the wrongfulness of

3   your conduct, and that's what Todd Raufeisen has

4   done.

5        Thank you, Your Honor.

6        THE COURT:  Thank you, Mr. Beckett.

7        We're going to take a ten-minute recess.  When

8   we return, I'll give the defendant an opportunity

9   to allocute, and then I'll pronounce sentence.

10        We'll be in recess.

11        THE CLERK:  Court is in recess.

12        (Recess at 11:23 to 11:38 a.m.)

13        THE COURT:  Mr. Beckett, Mr. Raufeisen, will

14   you please approach the podium?

15        Before I impose sentence, you have a right to

16   make a statement.  Do you wish to say anything?

17        THE DEFENDANT:  Yes, I do.

18        THE COURT:  You may.

19        THE DEFENDANT:  Your Honor, the most important

20   thing I want to do is to apologize to my victims.

21   I've written them; I have talked to them.  But it

22   was clear today that they feel that I'm not

23   sincere.  So, to Pete, Duncan, Joe, and Dave and

24   Robert in the audience, I do apologize.  I am

25   sincere.

1    I have read their affidavits and letters more
2 times than you can count.  The pain in my heart and
3 my soul will never go away.  The word "victim" is
4 one I cannot get out of my mind.  The victims are
5 my friends and my family, people and relationships
6 that I cherish even to this day.  I can assure you
7 I never meant to hurt anybody, but clearly I have.
8 My initial intentions were sincere, and numerous
9 initial investors were paid off, but as deals went
10 bad, I got more desperate.  The fear of failure,
11 the fear of letting my friends and family down led
12 me to terrible decisions and resulted me in
13 standing before you today as a failure, as a
14 criminal.  I am forever sorry.
15    I have spent a large part of my life doing the
16 right things, helping people, helping those
17 without.  I hope to be a productive part of society
18 and return to the roots of my upbringing, living by
19 the principles that originally made me successful.
20 I will spend all the time I have repaying the
21 victims and healing the pain that I have caused for
22 both them and their families.
23    I want to apologize to my family.  To my dad
24 who, after the initial shock and disappointment,
25 has been at my side and one of my biggest

1  supporters, I am sorry I let you down.  To my
2  children, who represent one of the most important
3  parts of my life, you have turned into talented
4  young people, and I am proud of both of you.  I am
5  glad you did as I said and not how I behaved, and I
6  am sorry for the pain I have caused you.  To my
7  lovely wife, I apologize for the pain and the
8  disappointment you did not deserve nor ask for or
9  were part of.  I thank you for sticking by my side.
10      The mistakes I've made will stick with me the
11  rest of my life as they are an Internet search
12  away.  Some of my closest friends have told me that
13  God has a plan for me; this clearly was not the
14  plan I had in mind.  I have taken full
15  responsibility for the damage I have done, and I
16  hope to get started on not only paying people back
17  but healing the faith they had in me.
18      Thank you.
19      THE COURT:  Thank you.
20      So, in imposing sentence, there's more than
21  just the statutory range.  In fact, really what
22  we're talking about here is the guideline range.
23  And I have to also consider whether or not that
24  guideline range or a sentence within it
25  appropriately addresses all of the sentencing

1  factors that I must consider in the statute, which
2  is Section 3553(a), so I'll begin with those.

3      The first one is the seriousness of the
4  offense.  And for six years you manipulated,
5  deceived and stole from your friends, acquaintances
6  and family.  You did this in a manner and the
7  method of forging promissory notes, signing fake
8  signatures on checks and even, it appears,
9  pretended to be one of the other guarantors on a
10  phone call or had somebody else do so, and these
11  were all direct -- included with direct lies about
12  where the money was going.

13      These were independently -- each and every one
14  of them -- deliberate and methodical criminal
15  behavior.  They were deceitful, and they were lies,
16  and there's really no other way to spin it.  These
17  were not business mistakes; these were not poor
18  judgment; this wasn't even necessarily
19  characterized as reckless behavior.  This was
20  lying, cheating and stealing, and you did so from
21  people who trusted you, and that's why the
22  abuse-of-trust enhancement has been applied.

23      Over six years, 22 investors were defrauded
24  through these actions, and it resulted in a
25  $1.7 million loss, and those numbers alone are

```
1   perhaps not accurately captured sufficiently by the

2   offense conduct -- or the offense level in this

3   case.

4       We know that this is more than numbers, as has

5   been discussed.  What you did was you capitalized

6   on the trust of people who weren't strangers to you

7   -- not even in the slightest -- and you also

8   capitalized on the status that you had built in the

9   community; and in that manner you were able to rob

10  Peter literally to pay James and David, rob Alex to

11  pay Chris, rob Duncan to pay Peter, and all to pay

12  you.  And really what this is is a classic Ponzi

13  scheme.  And the concern that I have about whether

14  or not the offense level accurately captures this

15  conduct is because other individuals with no

16  criminal history such as yourself could end up in

17  this same guideline range if they had only

18  conducted a one-time deal for the amount of more

19  than 1-1/2 million dollars with more than ten

20  victims and it was a one-time deal.  And this was a

21  sustained effort and deliberate effort over six

22  years to keep this lie alive involving more -- in

23  fact, more than double the threshold amount of ten

24  victims that the guidelines account for.  And each

25  and every time that you realized that you were
```

1  never going to be able to pay back the lie that you

2  gave to the investor when accepting their money,

3  you robbed from somebody else -- or you stole from

4  somebody else, I should say.  And each one of those

5  was an independent solicitation and not a one-time

6  deal.  And this, again, can never be characterized

7  as a lapse in judgment or a mistake because of the

8  sustained effort that you engaged in over this

9  significant period of time and the number of

10  individuals and the multiple continuous steps that

11  you took to take their money, and for that reason,

12  I think that a sentence certainly within the

13  guideline range and perhaps above would be

14  warranted based on this offense conduct.

15      I also have to be mindful of the need to avoid

16  unwarranted sentencing disparities.  And this is

17  always difficult in white-collar cases when there's

18  so many different variables, both in the offense

19  conduct as well as the personal history and

20  characteristics of each defendant.  And I've

21  reviewed my own cases that I've sentenced over the

22  years as well as my awareness of others, and I need

23  to make sure that I don't deprecate the seriousness

24  of what occurred here by giving a sentence that

25  would be, as Mr. Allegro pointed out, perhaps more

1   lenient than others who had been similarly situated
2   to you but had engaged in less serious conduct.
3       I wholeheartedly agree with the application of
4   the three-level reduction for acceptance of
5   responsibility because you did finally, when
6   confronted by authorities and with the advice of
7   counsel, admit and it appears to be admit fully
8   your involvement in this scheme.  But you had
9   opportunities to do that earlier, and you even had
10  opportunities before today to attempt -- even if it
11  was symbolic -- to make some payments toward
12  restitution.  And while those are not necessarily
13  aggravating factors, they are certainly not
14  mitigating, and it rings a little hollow, your
15  comments about a desire to pay these people back
16  when I haven't really seen any effort or attempts
17  for you to do so.  Much of that might be because of
18  your inability to do so.  I do recognize that even
19  though you have income coming in, you're more than
20  half a million dollars in debt, upside down on your
21  house, and have significant other legal troubles.
22      I will note, though, that it almost appears as
23  if this same theme is continuing as demonstrated
24  through some of your supporting letters about these
25  promises of still that ship coming in, about paying

1  the restitution.  It's like you're still saying,

2  "There's all these balls up in the air.  Maybe the

3  lawsuit will be favorable.  Maybe the sale of the

4  golf course" -- which I think has actually already

5  occurred -- "will be like" -- but none of those

6  balls are that Lotto ball.  It's just not the case.

7      And what ethical, moral and honest human

8  beings do when they fail -- which you've now

9  recognized has occurred -- is they accept that

10  loss, and they go about reacting to it within the

11  legal ways that one can do that, even if it means

12  declaring bankruptcy, even if it means moving out

13  of a home that you built and your family's used to.

14  It's the sacrifices that come with bad

15  circumstances.  But instead, what you did is you

16  engaged on a -- as I've already stated -- long-term

17  plan and activity in deceiving others.

18      The history and characteristics are also

19  something I must and do consider in this case.

20  And, again, white-collar crime is always a little

21  bit difficult.  Everybody has a different opinion

22  about it.  Everybody -- including the point that

23  your defense attorney raised, that this is a

24  non-violent offense, and it is, but it doesn't mean

25  that it's not criminal behavior.

1        I look at your personal history and

2   characteristics, and it's hard really for me to

3   reconcile why you're here, and it's difficult to

4   understand.  Many of the individuals that I

5   sentence -- in fact, most of the individuals that

6   come through this courtroom that face me, it's

7   unfortunate that they're here just like it's

8   unfortunate that you're here, but there is an

9   explanation in many of those circumstances because

10  they never had the good foundation that you had and

11  your parents provided to you.  They didn't have the

12  good childhood.  They didn't have the opportunity

13  and receipt of good education.  And they learned

14  right from wrong on the street, which is really no

15  education at all.  You learned right from wrong

16  from a stable family, and you were reckless with

17  that.  You fractured all of that.  And I also don't

18  claim to understand why, but what it seems to me,

19  based on this record, was that it was to maintain

20  appearances; it was pride; and it was a fear of

21  admitting failure; and it was a fear of being truly

22  honest about what had happened and maybe who you

23  are.  And you hid that not only from your

24  acquaintances, your investors and your family but I

25  think also from yourself, and that's the only way

1 that I can think of how you were able to every day
2 wake up and continue to engage in this fraud.  And
3 I don't know that I would term that sociopathic,
4 but I do think that it was, at best, deep denial.
5      White-collar crime, too, often prevents
6 individuals like you that had all these
7 opportunities -- you had so much, and yet it seemed
8 that you wanted more.  And once you started on that
9 path, it became a house of cards of sorts, and the
10 shell game began, and now the house has tumbled
11 down around you, both professionally and
12 personally.  And like I said, with individuals who
13 come before me with less fortunate backgrounds,
14 having engaged in street crimes as opposed to
15 white-collar crimes, I can in some instances
16 understand more because of -- their motivation to
17 engage in high-risk/high-reward behavior because
18 their options and opportunities are limited.  But
19 that wasn't the case for you, yet you still made a
20 decision to engage in this high-risk/high-reward
21 behavior that was criminal.  And just because you
22 are a middle-aged man in a suit and not a youth in
23 a hoodie doesn't make your behavior any less
24 criminal in the minds of this Court and also
25 certainly as contemplated by the sentencing

1  guidelines.

2      Your involvement in your children's lives and

3  your community involvement has been presented in

4  your defense as a mitigating factor, and community

5  involvement, of course, is to be lauded, and any

6  charitable efforts that you have made are, at first

7  glance, good, but I do agree in large part with the

8  government's characterization of much of this

9  community involvement is also being part of doing

10  business.  It was a collateral benefit of rubbing

11  shoulders with the very people that you needed to

12  do business with and ultimately defrauded.  And

13  while you might have also had -- and I have no

14  reason to doubt -- a dual desire to and motivation

15  to help people, it certainly had that collateral

16  benefit, and it's very difficult for me to truly

17  rely upon that as a mitigating factor.  Maybe --

18  and I'm not saying you were obliged to do this, but

19  what might abate that concern is if there were

20  examples of less public forms of community service,

21  but I don't have that before me.

22      Your involvement with your family is great and

23  makes this sentencing even more difficult and

24  bittersweet for you and for even the victims in

25  this case because they're victims, too, and it's so

1  unfortunate that as a result of your conduct so

2  much pain and so much hurt has been meted out to so

3  many different people on both sides of this case.

4      There are other sentencing factors, and your

5  attorney commented -- rightfully so -- that the

6  need for deterrence, general deterrence is usually

7  one of the driving forces and motivations for a

8  judge's sentence in white-collar crimes.  And part

9  of that was hinted at or expressly stated by -- I

10 think it was Mr. Hudgins that if slaps on the wrist

11 were handed out and probation or very light

12 sentences for this kind of criminal conduct, it

13 really would amount to the justice system's

14 endorsement of zero-interest loans.  And what would

15 be the deterrent effect from anybody who wanted to

16 engage in this kind of behavior if they knew that

17 the risk that they faced really was just minimal?

18 And ripping off investors and lying and cheating

19 and stealing comes with consequences, and a

20 sentence that I impose here today needs to be a

21 sentence that promotes respect for the law.

22     And I understand the argument that's made in

23 hopes of being a mitigating factor that because you

24 had a position in the community and perhaps the

25 higher you are, the greater the fall, that that

should be considered by the Court; that the
humiliation, stress and anxiety and damage to your
own reputation that your actions caused and being
prosecuted in this case caused should be taken into
consideration to perhaps mitigate the ultimate
sentence that I impose here, but I also have to
consider the stress and anxiety and humiliation
that was suffered by the victims in this case that
has been eloquently presented not in just the
statements today but also in the letters that the
Court has received and reviewed.  And, you know,
white-collar cases go significantly unreported in
this country because so many victims don't come
forward, and I'd imagine that a huge reason for
that is that it's not without feelings of
humiliation and guilt for basically being conned
and scammed.  Nobody wants to admit that they fell
for something, but there should be no guilt and
humiliation on behalf of the victims here today
because they didn't just exercise poor business
judgment; they were lied to.  They exercised due
diligence but relied on false pretenses.  And it's
good that they came forward because I do agree that
had the authorities not intervened -- because the
pleas of friends and family or friends at least

1  were not enough to stop this conduct and this train
2  wreck from going forward, that really what they did
3  was save other individuals from being victimized by
4  this Ponzi scheme.

5       Your family, as I mentioned before -- and I'm
6  sorry for the stress and pain that my sentence is
7  going to impose upon them, but you did this to
8  them, and it's your actions that are removing
9  yourself from their life.  And I hope that what you
10  said can be taken at face value, and I do believe
11  you -- at least as you stand before me here today
12  -- that you are committed to making every effort,
13  at least if you're not financially able to
14  restoring the faith that your family had in you,
15  and it appears to be fractured but not completely
16  annihilated because they're still standing behind
17  you, not just your immediate family but also your
18  extended family; and understandably it took some
19  time to get over the shock and the feeling of
20  betrayal, but they're there and that's something
21  that a lot of people who stand at that podium when
22  I impose sentence don't have.  And you need to be
23  thankful for that every single day.

24       And hopefully the victims' faith in you, if
25  not restored, at least what's happened here can

1   lead to some healing for them because, again, this

2   is more than just a financial crime; this is a

3   betrayal of trust and really unrecoverable damage

4   for some people, like Mr. Mangieri losing a

5   business, a 12-employee business, feeling like he

6   can't hold his head up high anymore in the

7   community which is, I'm sure, a feeling that is no

8   -- that feeling is something that you've

9   experienced since this whole thing went public.

10   But I do hope that the justice system and the

11   sentence that I impose here will address -- it does

12   adequately address -- and I believe it does, for

13   the reasons I've stated -- all of the sentencing

14   factors and promotes respect for the law and, by

15   promoting respect for the law, serves as an active

16   and general deterrent to other individuals so we

17   can avoid the pain and suffering that these victims

18   have gone through and your family as well.  And I

19   do hope that it promotes respect for the law in a

20   way that gives the victims some satisfaction, if

21   that's even possible at this stage, but it will at

22   least allow them to move forward; and also for you,

23   because I think that you've got a long way to go,

24   and all hope is certainly not lost.

25       While I don't think that the community

1  involvement and the other factors that your
2  attorney argued on your behalf are mitigating
3  factors significant enough for me to go below the
4  guideline range in this sentence, I do think that
5  they do demonstrate that you have a lot of talents
6  and gifts and a lot of good that you can give to
7  society.  You just happened to use those talents
8  and gifts in a destructive manner.  And I do hope
9  -- I guess what I'm trying to say is that I take at
10  face value that going forward your commitment is
11  positive and that you will take advantage of what
12  trust people do have left in you to build upon that
13  and restore their faith in you; and I hope that you
14  restore faith in yourself and that you stay
15  positive and that your healing begins not just when
16  you walk out through these doors, if not detained
17  today, but also through those prison doors.

18       Pursuant to the Sentencing Reform Act of 1984,
19  the defendant Todd Raufeisen is hereby committed to
20  the custody of the Bureau of Prisons for a period
21  of 72 months on each of Counts I and II to be
22  served concurrently.

23       Pursuant to the Mandatory Victim Restitution
24  Act, restitution in the amount of $1,723,606.27
25  shall be ordered payable to the 22 investors in the

1  amounts listed in paragraph 136 of the presentence

2  report.  Interest shall accrue on this restitution.

3      Said payments shall be offset by any moneys

4  returned to three victims who have civil suits

5  pending against the defendant.  These three victims

6  are Pete Mangieri in Knox County Case Number

7  16-L-38; Core Construction, Knox County Case

8  16-CH-89; and Alex McGehee, Rock Island County Case

9  Number 17-L-35.

10     Upon release from confinement, you shall make

11 monthly payments of at least 50 percent of your

12 disposable income per month during the entire term

13 of supervised release or until the restitution

14 obligation is paid in full.

15     I find that you do not have the ability to pay

16 a fine, and no fine is imposed as all assets shall

17 be given toward restitution payments.

18     Mr. Beckett, did you discuss the proposed

19 conditions of supervised release with your client?

20     MR. BECKETT:  I did, Your Honor.

21     THE COURT:  Do you have any objections to any

22 of those?

23     MR. BECKETT:  We have no objection to any of

24 the conditions of supervised release.  We feel

25 they're all adequately supported by the record.

1        THE COURT:  Okay.  Thank you.

2        Following your release from custody, you shall

3   serve a three-year term of supervised release on

4   each of Counts I and II to be served concurrently.

5   Within 72 hours of your release from custody from

6   the Bureau of Prisons, you shall report in person

7   to Probation in the district to which you are

8   released.  While on supervised release, you shall

9   not commit another federal, state or local crime.

10  You shall not possess a controlled substance.

11       And I find that you do not present the

12  likelihood of future substance abuse, and I'll

13  waive the drug-testing requirement pursuant to

14  statute.

15       Pursuant to law, you shall cooperate in the

16  collection of DNA as directed by Probation or the

17  Bureau of Prisons.  You shall not possess a

18  firearm, ammunition, destructive device or any

19  other dangerous weapon.

20       You shall comply with the following conditions

21  of supervised release:

22       You shall not knowingly leave the judicial

23  district without the permission of the court or

24  probation.  You shall report to probation in a

25  reasonable manner and frequency as directed by the

1  court or probation.  You shall follow the

2  instructions of the probation officer as they

3  relate to your conditions of supervision.  Any

4  answers that you give in response to a probation

5  officer's inquiries as they relate to your

6  conditions of supervision must be truthful.

7      You shall notify probation at least ten days

8  prior or as soon as knowledge is gained to any

9  change of residence or employment which would

10  include both the change from one position to

11  another as well as a change of workplace.

12      You shall permit a probation officer to visit

13  you at your home or any other reasonable location

14  between the hours of 6 a.m. and 11 p.m. unless

15  investigating a violation or in case of emergency.

16  You shall permit confiscation of any contraband

17  observed in plain view of probation.

18      You shall notify probation within 72 hours of

19  being arrested or questioned by a law enforcement

20  officer.

21      You shall not obtain employment at any place

22  where you will be involved in the management or

23  handling of cash, credit or any other financial

24  instruments without prior approval of the court and

25  without disclosing information regarding the

1  federal conviction to the employer.

2      You shall provide probation access to any

3  requested financial information, including both

4  your business and personal income tax returns.

5      Mr. Allegro, on the prior condition, is there

6  -- Mr. Allegro?  Mr. Allegro?  Don?

7      MR. ALLEGRO:  I'm sorry, Your Honor.

8      THE COURT:  On the previous condition where he

9  shall not obtain employment at any place where he

10  will be involved in the management of handling of

11  cash, credit or any other financial instruments

12  without prior approval of the court, is there any

13  objection to me including in that "or approval by

14  probation"?

15      MR. ALLEGRO:  No, Your Honor.

16      THE COURT:  Okay.

17      MR. BECKETT:  No objection.

18      THE COURT:  It's more lenient.

19      You shall provide to the probation office

20  access to any requested financial information,

21  including both your business and personal income

22  tax returns.

23      You shall not incur any new debts or open any

24  additional lines of credit in excess of $200

25  without prior approval of probation.

1        A special assessment of $200 is imposed,

2   payable immediately.

3        I'll make a recommendation that you serve your

4   sentence in a facility as close to your family in

5   Rock Island, Illinois, as possible.  I'll also make

6   a recommendation that you serve your sentence in

7   the least secure facility that Bureau of Prisons

8   will designate you to.  I'll make a specific

9   recommendation -- is there still the camp at Pekin?

10       MR. BECKETT:  I think it's closed.

11       THE COURT:  It's closed, yes.

12       MR. BECKETT:  I think Terre Haute has a camp.

13       THE COURT:  Do you still wish for me to

14   prioritize the Pekin recommendation?

15       MR. BECKETT:  I'm always concerned that if you

16   say it that it won't happen, but --

17       THE COURT:  I mean, because it's only an FCI,

18   there's not a camp.

19       MR. BECKETT:  I understand.  Yes, go ahead.

20       THE COURT:  Okay.  So, just so I understand,

21   would you prefer --

22       MR. BECKETT:  Terre Haute.  If you would

23   recommend Terre Haute.

24       THE COURT:  I'll make a recommendation that

25   you serve your sentence at the men's camp at Terre

1   Haute and, if not, at Pekin or any other facility

2   as close to your family home consistent with the

3   security designation from the Bureau of Prisons.

4        Mr. Beckett, have I addressed all of your

5   principle arguments in mitigation?

6        MR. BECKETT:  You have.

7        THE COURT:  And do you wish for any further

8   elaboration as to the sentence I imposed?

9        MR. BECKETT:  I do not.

10       THE COURT:  Okay.  At the time that you pled

11  guilty, you waived many of your rights to appeal.

12  To the extent that those rights were preserved in

13  the waivers and you wish to appeal this sentence,

14  you have 14 days from today to do so.  If you

15  timely notify your attorney of a desire to appeal,

16  he has an absolute duty to file that appeal on your

17  behalf.

18       Do you understand?

19       THE DEFENDANT:  Yes, Your Honor.

20       THE COURT:  Mr. Allegro, is there anything

21  further on behalf of the government?

22       MR. ALLEGRO:  No, Your Honor.

23       THE COURT:  Mr. Beckett, anything further on

24  behalf of Mr. Raufeisen?

25       MR. BECKETT:  No.  Are you going to have him

1   surrender?

2        THE COURT:  We'll discuss that.  Is there any

3   objection to the defendant's self-surrender?

4        MR. ALLEGRO:  No, Your Honor.

5        THE COURT:  Okay.  I have no reason to believe

6   that Mr. Raufeisen has not been wholly compliant

7   with the conditions of pretrial release since the

8   time of his plea and, absent objection, noting no

9   objection from the government, I will allow you to

10  self-report to the Bureau of Prisons.

11       I will release you on the same conditions of

12  bond that were previously imposed.  I want to

13  advise you, though, of a few things:  The

14  circumstances have changed now that a sentence has

15  been imposed.  If you violate any of those

16  conditions of bond, you'll be arrested and

17  immediately remanded to the custody of the marshals

18  for transport to the Bureau of Prisons to begin

19  serving your sentence.

20       And if you do not appear at the designated

21  Bureau of Prisons facility at the date and time as

22  directed, then you could face additional charges

23  for escape.

24       Do you understand?

25       THE DEFENDANT:  Yes, ma'am.

1        THE COURT:  I propose a self-surrender date of

2  October 23rd at 10 a.m.  Is there any objection to

3  that date?

4        MR. ALLEGRO:  No, Your Honor.

5        THE COURT:  Mr. Beckett?

6        MR. BECKETT:  No, Your Honor.

7        THE COURT:  All right.  Anything further on

8  behalf of your client?

9        MR. BECKETT:  No, Your Honor.

10        THE COURT:  All right.  Good luck to you, sir.

11  We'll be adjourned.

12        THE CLERK:  Court is adjourned.

13        (Proceedings concluded at 12:11 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

<u>CERTIFICATE OF OFFICIAL REPORTER</u>

3

4

    I, Jennifer E. Johnson, CSR, RMR, CBC, CRR,
5  in and for the United States District Court for the
Central District of Illinois, do hereby certify
6  that pursuant to Section 753, Title 28, United
States Code that the foregoing is a true and
7  correct transcript of the stenographically reported
proceedings held in the above-entitled matter and
8  that the transcript page format is in conformance
with the regulations of the Judicial Conference of
9  the United States.

10       Dated this 24th day of October, 2017.

11

12               <u>/s/ Jennifer E. Johnson</u>
                JENNIFER E. JOHNSON
13              CSR, RMR, CBC, CRR
              License #084-003039

14

15

16

17

18

19

20

21

22

23

24

25